UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MATTHEW FERO, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Consolidated Case |
| ) | No. 6:15-CV-06569 EAW |
| EXCELLUS HEALTH PLAN INC., ET ) | |
| AL., ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| ) | |
| ) | |
| ) | |

VIDEOTAPED DEPOSITION OF JONATHAN M. ORSZAG

Los Angeles, California

Wednesday, October 30, 2019

Stenographically Reported by:
AMANDA J. KALLAS
CSR No. 13901
Job No. 3567249
PAGES 1 - 169

Page 42

1  and experience designing conjoint analysis, I will
2  defer to others.
3    Q  Okay.  And as -- is his report the only
4  material produced by him relating to conjoint other
5  than published papers that you've ever reviewed?
6    A  I believe --
7       MR. KARLSGODT:  Objection to the form of the
8  question.  And improper foundation.
9       THE WITNESS:  I believe so, yes.  But
10 sitting -- I mean, it's possible that I've seen
11 something else.
12 BY MR. MILLER:
13   Q  Okay.  Do you have any reason to doubt that
14 Professor Allenby has a requisite skill and training
15 to design and implement a conjoint analysis?
16   A  Same answer I just gave, I have no view one
17 way or the other.
18   Q  Okay.  So we've -- we've used a weird word
19 for normal people for a long time now called
20 "conjoint analysis."
21      Can you explain what conjoint analysis is?
22   A  It's a shorthand description of a -- the
23 concept of considered jointly surveys.  And the most
24 basic idea I think in -- I'll -- I'll just -- I'll
25 be in Professor Allenby's framework, is a

Page 43

1  choice-based conjoint survey.
2       There are other versions of conjoint that one
3  can find out they're, say, rating -- say rating
4  based or ranking based.  But we'll be in a
5  choice-based world, because that's the world in
6  which we're operating in terms of the reports.
7       And what the survey does is it gives survey
8  respondents a -- a choice set to choose from, where
9  one varies various features of the choices -- the
10 products that they have access to or choose from.
11 And based on those survey responses, one can use
12 that data to analyze and develop the value of
13 various product features.  If the survey is
14 implemented appropriately and the -- and you get
15 reasonable responses.
16   Q  Okay.  And so conjoint analysis, assuming
17 that you -- it's designed correctly, would you agree
18 that it's a recognized scientific methodology for
19 estimating the value of product features?
20      MR. KARLSGODT:  Objection to the form and
21 foundation of the question.
22      THE WITNESS:  I -- I won't agree to the
23 precise words that you use there, but what I'll
24 agree is it's a tool that is used, although it may
25 not be the preferred tool that is used, to measure

Page 44

1  the value of product features.
2  BY MR. MILLER:
3    Q  And I -- and whether it's preferred or not,
4  is it an economic methodology that can be used
5  reliably to estimate the value of product features?
6       MR. KARLSGODT:  Objection to the form of the
7  question.  Improper foundation.
8       THE WITNESS:  In certain circumstances, it is
9  a tool that can be used to measure the value of a
10 product feature.
11 BY MR. MILLER:
12   Q  Okay.  In a reliable way?
13   A  In a reliable way.
14   Q  Okay.  So you said sometimes it's a tool
15 that's used, and it may not be the preferred tool.
16      When would you consider conjoint to be a
17 preferred tool, and when would you consider it to
18 not be a preferred tool?
19   A  Surveys have pros and cons.  And one con, for
20 example, is it -- it may not reflect real world
21 transactions, that what people say and what they do
22 may be different.  And so when one has available
23 transaction data, for example, transaction data may
24 provide a deeper insight into the value of a product
25 feature than the use of a survey.  On the other

Page 45

1  hand, transaction data may not be feasible for a new
2  product offering, or a new feature.  And so a survey
3  appropriately designed in it -- those circumstances
4  where a survey could make sense, can provide better
5  insight than, say, the use of transaction data.
6    Q  Okay.  And what about retrospectively using
7  survey data to value a product feature in the sort
8  of but-for world that it's being used in this case?
9  Is -- is it your opinion that conjoint can be a
10 reliable tool in that situation, under the right
11 circumstances and designed correctly?
12      MR. KARLSGODT:  Objection to the form of the
13 question.  Vague.
14      THE WITNESS:  When one has available
15 transaction data, it's -- one would have to -- when
16 one has appropriate transaction data, those real
17 world transactions would trump hindsight surveys in
18 every circumstance that I can consider sitting here
19 today.
20 BY MR. MILLER:
21   Q  Okay.  And I understand that.
22      So putting that to the -- to the side, when
23 there is not actual transactional data available,
24 can conjoint analysis be used reliably to estimate
25 the value of a product feature?

1  A  It depends on the circumstances, so I can't
2  give you a general answer there.
3  Q  Okay.  But it's -- it's possible; would you
4  agree that?
5  A  As a matter of theory, it's possible.  But
6  there's many conditions that would need to be met in
7  order for that theoretical possibility to be
8  correct.
9  Q  Okay.  So I -- I want to go back just a
10  little bit.  You said for surveys in general, they
11  may not reflect what's happening in the real world
12  because you're asking people what -- what their
13  opinion is rather than looking at what they actually
14  do; right?
15  A  That is correct.
16  Q  Okay.  But conjoint analysis is not -- would
17  you agree with me that conjoint analysis is slightly
18  different than general survey analysis of asking
19  opinions because conjoint asks the survey taker to
20  pick a product with certain features, it does not
21  ask them their -- it does not directly ask their
22  opinion about any specific feature?
23  A  True.  But you -- you're asking for how -- if
24  presented a choice set, what they would choose and
25  what they say they may choose could be very

Page 47
1  different than if they actually had to shell out
2  their own money and what they may choose in the
3  marketplace.  Especially when the choices in the
4  marketplace are different than the choices presented
5  to them in a conjoint survey, by definition, has to
6  limit the information that is conveyed, or if not,
7  you would overload the survey respondent.
8  Q  Right.
9     But what I'm trying to get at is, conjoint
10  analysis is not a survey where you ask someone,
11  "what do you think about wireless connectivity being
12  included on a camera"; it's a methodology where you
13  give the survey respondents various cameras, with
14  different product features on them, with prices,
15  with brands, and ask them, in an indirect way, to
16  show their opinion through their -- their survey
17  choice of a product?
18  A  As I answered, what people say and what
19  people do can be different.  You're not asking, in a
20  conjoint survey, for somebody to open up their
21  wallet or take out their credit card and make an
22  actual buying decision.  You're asking them to say
23  what they would do.  And what an individual says
24  they will do and what they actually may do can
25  differ.  And so if one's between those two choices

Page 48
1  of what somebody says and the actual decision where
2  they have to open up their wallet and make a
3  decision, that -- the information that is conveyed
4  by them opening up their wallet and making a
5  decision is far more valuable and accurate than
6  relying solely on what people say they will do.
7  Q  Okay.  Are you aware of any studies where the
8  authors were able to compare conjoint preferences
9  that were provided on a survey method with real
10  world transactional data relating to the same
11  subject matter?
12  A  It's been some time since I've reviewed
13  various papers.  I believe, if I recall, in one
14  paper that may have been cited in Professor Rossi's
15  book chapter, that that work was done.  But sitting
16  here today, I don't -- I don't have a fresh
17  recollection.  But it would not surprise me that
18  somebody has actually tried to test whether survey
19  results for a particular product feature produce
20  results similar to what one observes in the
21  marketplace.
22  Q  Okay.  And would it surprise you that the
23  transactional data confirmed that the conjoint study
24  was reliable?
25     MR. KARLSGODT:  Objection to the form of the

Page 49
1  question.  Vague.
2     THE WITNESS:  I'm -- I'm aware of
3  circumstances generally where surveys have been
4  correct, and when they have been incorrect.  And so
5  I -- I am not aware of any systematic analysis that
6  has -- sitting here today, that has tested in
7  circumstances, like for the healthcare space, where
8  there's a relationship between a conjoint result and
9  a transactional result.
10  BY MR. MILLER:
11  Q  Okay.  And I'm not asking you to -- to say
12  every conjoint study is going to give you reliable
13  data that would match up with real-life
14  transactional data.  I'm just -- I think you said
15  this before, it is possible, through conjoint study,
16  to get a reliable estimate of -- that would line up
17  with actual transactional actions that people take
18  in the real marketplace; is that correct?
19  A  I guess it's possible because a broken clock
20  is also right twice a day.  So I don't know if I --
21  the answer is yes.  I think that generally speaking,
22  there are circumstances where -- in -- in sectors in
23  the marketplace, where appropriately designed
24  conjoint analysis can produce reliable results.  But
25  there are certain conditions in -- under which it's

Page 94

1  Q  And what expert were you responding to?
2  A  Professor Rossi.
3  Q  Okay. And that's Peter Rossi?
4  A  Yes.
5  Q  And you know where he's a professor?
6  A  Yes. At UCLA.
7  Q  And in Premera, did Professor Rossi actually
8  conduct a conjoint study for class certification?
9  A  No.
10 Q  Okay. And was that -- did you criticize him
11 for that as well?
12 A  Yes.
13 Q  Okay. But other than this case and Premera,
14 you're not familiar with the level of -- of detail
15 or implementation of a conjoint study at the class
16 cert phase?
17 A  I -- I am not a lawyer. I am an economist.
18 Q  Okay.
19 A  And as an economic matter, Professor
20 Allenby's report does not provide sufficient
21 information to determine -- in fact, it's quite
22 clear, it's -- it's not possible from what he's
23 proposed to do, that one can produce any reliable
24 results.
25 Q  So are you -- is your criticism that there is

Page 95

1  no way to do that, or just you don't believe that
2  Professor Allenby has sufficiently set forth a way?
3      MR. KARLSGODT: Objection to the form of the
4  question. Compound.
5      THE WITNESS: Given the facts and
6  circumstances in this case, I do not see a way in
7  which what he has proposed to do, it is possible to
8  measure damages on a class-wide basis reliably.
9  BY MR. MILLER:
10 Q  Okay. Did -- so do you understand that
11 Professor Allenby at his deposition even agreed --
12 I'm paraphrasing, but agreed essentially that
13 conjoint analysis isn't always recommended or isn't
14 always going to be reliable for a certain situation?
15 Are you familiar with that?
16 A  Generally, I agree -- I can agree to that
17 general proposition.
18 Q  Okay.
19 A  Yes.
20 Q  Yeah.
21    And he -- he gave some examples like sensory
22 experiences or sense are not good for survey
23 methodology and conjoint analysis because they're
24 difficult to -- they mean different things to
25 different people, stuff like that. They're sensory

Page 96

1  experiences.
2  A  I -- I haven't reviewed that --
3  Q  Okay.
4  A  Or I don't recall that section of the
5  testimony, but I can agree to that first proposition
6  that you offered, that conjoint may very well be a
7  poor estimator of damages in certain cases.
8  Q  And I -- I guess -- well, let's just go --
9  let's just go to the details more, I guess.
10    So I want to paraphrase again another of your
11 critiques of Professor Allenby's report. And that's
12 that -- you say that he's -- we --
13    Do you say that he's used data security
14 attributes and levels that are not meaningful?
15 A  I -- I prefer to use my precise words than
16 your paraphrasing of those -- of those --
17 Q  Okay.
18 A  -- of those words. But as a general matter,
19 I -- one of my critiques of his report is that the
20 words that he proposes to use do not connect to real
21 world -- the real world situation.
22 Q  So I guess maybe it's helpful to just turn to
23 the sections of the report.
24 A  Page 25 of my report we can go to, if you'd
25 like.

Page 97

1  Q  All right. So -- so in this section, it
2  starts on Page 24 of your report, your criticism is
3  of the use of the -- of the -- both the attribute
4  itself, data security practices, and of the levels
5  that will be offered, which are "all" and "most"; is
6  that correct?
7  A  I -- I think I focus more on the -- the
8  latter than the former.
9  Q  Okay. So you are -- your criticism is more
10 that "all" and "most" are not -- not good
11 descriptions of the attribute or levels of the
12 attribute; is that correct?
13 A  I -- there's no connection between those
14 words and actual practices in any meaningful way
15 that could be useful from an economic perspective
16 for measuring damages in this case.
17 Q  Well, so what has to be -- do you -- do you
18 think consumers can understand the difference
19 between "most" and "all"?
20    MR. KARLSGODT: Objection to the form of the
21 question. Vague.
22    THE WITNESS: I believe that's a -- as a
23 matter of -- of words and semantics, yes, they
24 understand "all" versus "most." But what -- what
25 that means to their purchasing decisions, those are

Page 118

1  may have less value and some may have more, of
2  course.
3    Q  Are you aware of any studies that find,
4  after -- after putting a feature on a conjoint
5  survey, that the respondents did not ascribe any
6  part worth value to that feature?
7    A  I mean, I haven't committed every -- usually
8  when the -- when that's the case, it's a feature
9  that's insignificant, so I have not sort of
10 committed those to memory.  But that -- I've -- I
11 couldn't give you examples in hedonic regressions
12 that features didn't matter, but I'm absolutely
13 positive it happens.
14   Q  Okay.  And if -- if -- if that's the case
15 then, if the feature doesn't matter, including on
16 those surveys did not result in the consumer valuing
17 it; right?  If you got -- if the result of the
18 survey, there's no part worth value to the
19 feature -- the consumer has told you, through the
20 survey, through their choices, that it didn't matter
21 to them.  You haven't told them by not having it on
22 the conjoint that it doesn't matter to them.
23   A  And why --
24      MR. KARLSGODT:  Hold on, make -- make sure
25 you give a pause so I can make an objection.

Page 119

1      MR. MILLER:  Strike -- strike -- strike the
2  question.  Strike the question.  Okay.
3  BY MR. MILLER:
4    Q  Do you believe that if an insignificant -- an
5  insignificant feature to a consumer is placed on a
6  conjoint survey that one would expect that the
7  result of the survey would be to conclude that the
8  feature does not contribute part worth value to the
9  product?
10   A  I cannot agree to that proposition because by
11 the inclusion of it, if it is not, in the real
12 world, a factor, that may put extra emphasis on it,
13 and thus overstate the value of that feature.
14   Q  So then how do you -- how -- how do you
15 determine what is important to the consumers?
16   A  By going into the -- instead of dictating to
17 consumers what they -- you think they should
18 consider, one should listen and use real world data
19 about what they do consider.  And Professor Allenby
20 has not put forward any evidence that the -- that
21 consumers consider data security, A.  And there --
22 the paper -- paper or papers that he cites show that
23 consumers value significantly the provider network,
24 a factor that he did not include in his proposed
25 conjoint survey.

Page 120

1    Q  So I'm trying to understand.  You're saying
2  that we can never -- are you saying that we can
3  never measure insignificant attributes because
4  simply including them on the survey is going to
5  result in them being valued?
6    A  No, that's not what I'm saying.  Not at all.
7  Quite the contrary.
8    Q  Okay.  Would you expect, in a conjoint
9  survey, that if a product feature had no value to
10 consumers that the result of the survey would be
11 that it contributed no part worth value to the
12 product?
13   A  If one includes all of the attributes which
14 have value to consumers, one -- the consumer will
15 discount the one -- the -- the insignificant one.
16 But if one ignores the factors and attributes that
17 consumers value, but include insignificant ones,
18 consumers may assign value to the insignificant one
19 that an other -- otherwise would have gone to the
20 appropriate one that they would have considered,
21 which had been excluded from the study.
22   Q  Okay.  And what -- what are -- what are your
23 sources for that?
24   A  I cite to those in -- in my report.
25   Q  Can you point me...

Page 121

1    A  Footnote 100 would be one example.
2    Q  Is it -- is it all of the sources in 100, or
3  is it -- or is it the last one?
4    A  I think there are three sources, and I --
5  this comes up in all three, if I recall.
6    Q  Okay.  And you -- you keep saying that if you
7  include an attribute that's insignificant and
8  exclude others, that respondents may assign value to
9  it.
10      Do you expect that they will assign value to
11 it?
12   A  You create the environment for potential bias
13 by excluding relevant factors and including
14 irrelevant ones.
15   Q  But do you expect that you will -- that
16 people will assign a value to something they
17 formerly thought was -- didn't even think of or
18 thought was insignificant simply because it's
19 included?
20   A  That's the risk, and that's why one should
21 seek not to do that.  And that's precise -- I don't
22 think, if you read Professor Allenby's work, he's --
23 he makes those arguments when he's writing in his
24 academic work that one should include meaningful
25 attributes as part of the analysis.  He doesn't say,

Page 146
1  If you put into the conjoint a fake price,
2 you will get fake answers.  And my point is that if
3 one is analyzing the group market, one has to
4 reflect the real world of what the group choices
5 are, not just have make-believe prices.
6      Q  Okay.  So -- but you agree in conjoint that
7 the -- the attributes are combined in ways that
8 don't necessarily reflect the same items that exist
9 in the real world as a tool to understanding
10 consumer preference and valuation of certain
11 attributes?
12     A  Potentially, yes.  But if the price -- the
13 differences in the prices between those options are
14 not -- doesn't -- don't comport at all with the real
15 world, then the inferred value for each of the
16 changes will be wildly wrong.
17     Q  Don't you sometimes -- don't -- in some
18 instances, couldn't you have a conjoint at least one
19 survey where price was the same for each product?
20    A  That is correct.
21    Q  Or --
22    A  You could -- that is correct.  But you asked
23 me at the beginning of this whole thing about gold,
24 silver, and bronze plans.  And my point was that the
25 price of those different products could be -- could

Page 147
1 be very different in the group market.  And the
2 differences in the prices that would be negotiated
3 by that benefits manager need to be reflected in the
4 choice set that is being offered, or if not, you're
5 not getting -- you will not have appropriate
6 calculations of the value of each product feature.
7     Q  Okay.  So I think maybe we just started with
8 a -- an example that maybe wasn't the best one to
9 start off with.
10        But would you agree that -- that conjoint is
11 about offering products with various features that
12 may not actually exist in the real world, and
13 determining people's -- determining the part worth
14 of the different features based on people's
15 expressed valuations through their choices of the
16 products in the product grid?
17    A  One way in which conjoint has been used is to
18 create a hypothetical world for a -- say, a new
19 product feature.  But that doesn't mean that we
20 should divorce the elements of the products that
21 would be offered -- the other elements of product
22 features from reality as part of that analysis,
23 because you start adding a new product feature on
24 top of incorrectly specified product features, and
25 that leads to unreliable results.

Page 148
1     Q  Okay.  Another one of your critiques of
2 Professor Allenby's report is, you -- you make a
3 claim that he hasn't determined that preferences
4 relating to data security have not changed over
5 time; is that correct?
6     A  That is correct.
7     Q  Okay.  And I guess your -- so the -- what
8 you're basically saying is, for data security, it's
9 impossible to use survey data today because the
10 demand for data security practices has increased,
11 and you base -- are you basing that off of some
12 surveys?  Is that the gist?
13    A  I don't agree with your -- the description.
14 The way I would describe it is, he makes an
15 assumption, this assumption -- and I don't think
16 there's a disagreement, I think he actually
17 explicitly makes this statement.  That in his view,
18 the preferences today are similar to the preferences
19 at the time that the decisions were made.  Period.
20 That is an assumption.
21        The question is, he has no empirical support
22 for that assumption, he doesn't put forward any, he
23 doesn't suggest any.  He says, period, that is my
24 assumption.
25    Q  Okay.

Page 149
1    A  I present --
2        If I may.
3    Q  Yeah.
4    A  -- a variety of different data points that
5 show that it's quite likely that preferences have
6 changed quite significantly during this time period,
7 in fact, almost certainly have changed
8 significantly.  And he -- it's -- it's incumbent
9 upon him, making the assumption, to justify his
10 assumption, but he has not put forth any support for
11 that.  And that is the critique of his -- on -- on
12 this point.
13    Q  Okay.  But you don't -- would you agree that
14 you do not have any -- can you tell me how much
15 consumer preference for data security has changed in
16 the last ten years?
17    A  I can't give a precise point estimate.  But I
18 point to a whole host of evidence on a number of
19 pages, from surveys to data about actual breaches,
20 that suggest that there have been quite significant
21 changes in people's views about the security of
22 their data, of their personal information.  And that
23 those views have not been stable over time.
24    Q  Does -- so -- but does that necessarily mean
25 that the part worth value that a consumer would

Page 150

1  place on data security would be any different?
2      MR. KARLSGODT: Objection to the form of the
3  question. Improper foundation.
4      THE WITNESS: Professor Allenby makes the
5  assumption that it -- that the preferences are the
6  same. The preferences are not the same, that would
7  cause a change in that part worth.
8      And he provides no justification for that
9  assumption. No empirical evidence, no data, no
10 nothing. Literally zero. It's just a statement
11 that it is the assumption.
12     I have a variety of survey evidence and other
13 evidence that suggests there's been quite
14 significant changes in perceptions about data
15 security. This is not my assumption; this is his
16 assumption. So it's not my -- he has to prove that
17 his assumption is correct in order to make it.
18 BY MR. MILLER:
19   Q  Okay. And so in your report, the surveys
20 that you're referring to, are those -- are those --
21 so I guess what -- what you're saying, and correct
22 me if I get it wrong, you're saying, first, wasn't
23 your burden to -- to cite any surveys whatsoever,
24 you think the report is flawed because there is an
25 assumption regarding consumer preference for data

Page 151

1  security that it hasn't changed over time, and that
2  you don't believe there's support for that
3  assumption?
4      MR. KARLSGODT: Objection to the form of the
5  question. Compound.
6      THE WITNESS: I think the simplest way to say
7  it is if I included nothing to support the evidence
8  that suggested it has changed, it's still his --
9  it's incumbent upon him as a researcher to explain
10 his assumptions and the bases for his assumptions.
11 He failed to do that. That's -- that's his burden
12 to do that, as a researcher, to explain his logic
13 for that.
14     But I go beyond that. I don't just say,
15 well, he -- it's a burden on him to do that. I then
16 present pages of evidence that are consistent with a
17 significant change in preferences and inconsistent
18 with his assumption.
19 BY MR. MILLER:
20   Q  And so the -- the -- the studies you cite,
21 none of them relate specifically to health
22 information; is that correct?
23   A  I would need to look at each and every one,
24 there may be that there's cross tabs in some of
25 these that look at companies specific that deal with

Page 152

1  health companies.
2      But sitting here today, I don't recall any
3  that are specifically on -- on health information.
4  But there may be cross tabs undergirding certain of
5  these that would allow for an analysis just of
6  health.
7    Q  Okay. And you're not saying definitively
8  that you have any evidence that the part worth
9  demand for data security has increased, relevant --
10 relative to other attributes over time. You're just
11 saying that some survey evidence leads you to
12 believe that it's something that should be looked
13 into; is that fair?
14     MR. KARLSGODT: Objection to the form of the
15 question. Compound. Improper foundation.
16     THE WITNESS: I think that it's incumbent
17 upon Professor Allenby to support his assumptions.
18 He's failed to do that. If he puts forward evidence
19 that supports his assumptions, I can evaluate that
20 evidence, period.
21 BY MR. MILLER:
22   Q  So in -- in your opinion, is it necessary
23 when conducting conjoint to determine whether
24 preferences have changed between the time the survey
25 is conducted and the time you want it to apply to?

Page 153

1    A  It's not -- I mean, Professor Allenby has
2  stated that that's his assumption, that there hasn't
3  been a change. So I don't think there's a
4  disagreement that it's a necessary condition of his
5  model for a survey today to apply to other time
6  periods for preferences not to have changed. And he
7  has not presented any evidence that that -- that
8  that is consistent with that conclusion.
9    Q  Okay. Are you aware of any tools or ways to
10 adjust models in conjoint analysis to take into
11 account possible changes in preference over time?
12   A  I'm aware generally of ways that you can take
13 into account changes in market structures and -- and
14 consumer preferences, but it's not clear how one
15 would do that in this case.
16   Q  Okay. You have some other criticisms, I just
17 want to go over -- or critiques, I want to go
18 over -- one is related to the sample size, you say
19 it may be on the low side. Is that something that
20 can be corrected by just increasing sample size?
21   A  Within its own four corners, adding sample
22 size may correct that. But obviously, you have an
23 issue of making sure they're good respondents, et
24 cetera, but within the four corners, the -- my point
25 here was he provided no support for the conclusion